## STATE of Maine

v.

## Roger DUTREMBLE.

Supreme Judicial Court of Maine.

Oct. 17, 1978.

---

1. The indictment in the instant case alleged that Boyer intended to commit the crime of theft.

William R. Stokes (orally), P. J. Perrino, Jr., Asst. Attys. Gen., Augusta, for plaintiff.

Mongue & Martineau by Fernand A. Martineau (orally), Robert E. Mongue, Kennebunk, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and NICHOLS, JJ.

POMEROY, Justice.

On July 13, 1977, defendant Roger Dutremble was indicted in the Superior Court, York County, on one count of criminal homicide in the second degree (17–A M.R.S.A. § 202 (Supp.1976)).[1] Following a jury trial, he was convicted of criminal homicide in the fourth degree with a dangerous weapon. (17–A M.R.S.A. § 204 (Supp. 1976)).[2] From judgment entered on the verdict he now brings this appeal.

---

1. 17–A M.R.S.A. § 202 (Supp.1976) reads in pertinent part:

   *1. A person is guilty of a criminal homicide in the 2nd degree if:*

   *A. He causes the death of another intending to cause such death, or knowing that death will almost certainly result from his conduct.*

2. 17–A M.R.S.A. § 204 (Supp.1976) reads in relevant part:

Defendant raises three main issues on appeal. The first sets forth the contention that his trial was fundamentally unfair.

The second asserts that the trial Justice erred in excluding evidence of deceased's character and reputation.

Finally, defendant contends that the trial Justice erred in denying that part of a pre-trial motion which sought discovery of any and all of deceased's criminal records.

We deny the appeal.

Through the testimony of numerous witnesses called by both the State and defendant, the jury would have been justified in finding the following facts. Prior to July, 1977, defendant was employed as a long haul trucker, a job often requiring lengthy absences from home. While away on what proved to be his last trip before the shooting incident, defendant's wife rented an apartment at 73 Alfred Street in Biddeford. Defendant, never having seen the apartment, returned there during the afternoon of July 1, 1977. From that point until the fatal shot was fired, defendant and his neighbors engaged in an almost continual verbal, and at times physical battle.

On July 2, 1977, an argument broke out between defendant and his wife over her choice of the new apartment. At some point either during the argument or at its conclusion, Howie Michaud, III, a fifteen-year-old, living in the apartment directly above defendant's, offered his porch as a sanctuary for Mrs. Dutremble. Evidently viewing such an invitation as an unwarranted interference in his marital affairs, defendant told Howie to go back to his own apartment and mind his own business. Whether defendant also threatened Howie is unclear, though that was clearly the story related to Daniel Lubinsky, a roommate of Howie and his father.

In the late evening of July 2, 1977, Lubinsky, having taken exception to defendant's "*threat*" to Howie, sought a clarification of the incident from defendant. A fight ensued, leaving both parties with injuries requiring temporary hospitalization. At the height of the altercation, defendant's wife notified the police, who, though responding to the call, refused to take any action against Lubinsky.

The following day, July 3, 1977, the verbal battle continued. Threats and insults were traded between defendant, his wife and brother on one side and Lubinsky, Howie's father and others on the other side. Defendant's attempts to involve the police were again unsuccessful, though they always responded to defendant's or his family's calls.

On July 4, 1977, the insults and threats became more heated. Claiming he feared for the safety of his family, defendant removed a hunting rifle from his car to his apartment, where he and his brother showed Mrs. Dutremble how to use it. Following her "*lesson*", Mrs. Dutremble retired to the porch, which fronted on Alfred Street. While there, she was verbally threatened from across the street by one Dave Harvey. Mrs. Dutremble immediately recounted the story to her husband and his brother, who proceeded out onto the porch to see if Harvey was still there. Meanwhile, Mrs. Dutremble called the police, who again responded, but still refused to take any action, claiming they had not seen the incident and, therefore, were powerless to act.

The police's continual refusal to arrest Lubinsky or his friends had earlier prompted defendant to schedule an appointment with Biddeford's Mayor for the following morning. Defendant hoped that at such a meeting, he could convince either the Mayor or the Chief of Police, that police action was needed to settle the growing animosity with Lubinsky. Needless to say, the meeting never took place. Defendant did, however, tell the officers investigating the Harvey incident that "*justice would be done.*"

---

1. *A person is guilty of criminal homicide in the 4th degree if he:*
*A. Recklessly causes the death of another human being.*

The effect of the jury's finding that defendant committed the above crime with a dangerous weapon was to raise the crime from a Class B offense to a Class A offense. 17-A M.R.S.A. § 1252(4) (Supp.1976).

After the police departed, defendant and his brother remained on the porch. Shortly thereafter, Lubinsky and several of his friends arrived at the base of the steps leading up to the porch. Sensing a confrontation, a large crowd began to gather. By that time, defendant had retrieved his rifle from the apartment and his brother had armed himself with a baseball bat. Insults were traded between Lubinsky and his friends and defendant and his brother. Bruce Ewald, a friend of Lubinsky, thereupon started up the steps, but quickly retreated when defendant moved forward with the rifle.[3] Lubinsky, stating he had a right to enter his own apartment building, then moved forward. At almost that precise moment, a bottle was thrown from the crowd, hitting defendant's brother on the side of the head. He immediately slumped to the floor. Within the next few seconds, defendant's rifle discharged, the bullet striking Lubinsky in the chest. At that point chaos broke out. Defendant and his brother quickly returned to the apartment. Lubinsky, bleeding heavily, stumbled a short distance up the street before falling. The police were immediately notified and shortly thereafter, Lubinsky was taken to the hospital, where he died some hours later. Defendant was arrested after a short holdout in his apartment.

## I.

Defendant raises as his first point on appeal that his trial was fundamentally unfair. Such a contention is based on several specific allegations of error; namely: that the trial Justice erred in not instructing the jury on the defense of accident; that the jury instructions covering self-defense and criminal homicide in the fifth degree were inadequate; that the trial Justice made prejudicial remarks;[4] that the trial Justice erred in not allowing the alleged murder weapon and ammunition to be sent to the jury room at the same time; and finally, that it was reversible error for the trial Justice to deny defendant's motion for the making of a record at the grand jury proceedings.

■ It is clear from the record, and is conceded by defendant, that no objections were made at trial to any of the alleged errors.[5] This Court has long held that such omissions at least with regard to jury instructions, or the lack thereof, precludes the appellant from raising any resulting error on appeal. Rule 30(b), M.R.Crim.P.; *State v. Gagnon*, Me., 379 A.2d 395, 397 (1977); *State v. Pomerleau*, Me., 363 A.2d 692, 698 (1976). Defendant argues, however, that the trial Justice's actions constituted *"obvious error"* and are thus cognizable by this Court despite the absence of a timely objection. *See* Rule 52(b), M.R.Crim.P. To succeed on such an argument, defendant must

*satisfy this Court (by a fair preponderance) that the Justice's failure to give the instruction resulted in manifest injustice such as virtually to deprive the Defend-*

---

3. There was conflicting testimony as to whether defendant actually pointed the gun at Ewald, or merely waved it in his direction. In either case, Ewald's response clearly showed he feared for his safety.

4. Defendant relies on the trial Justice's isolated remark that *"I'm going to give you more instructions of law than you could possibly use,"* to support the claim of prejudice.

5. Defendant, having had new counsel appointed to prosecute this appeal, now claims that trial counsel's failure to make timely objections to the alleged errors evidences that he was inadequately represented at trial. As we have pointed out on several previous occasions,

   [t]his issue may not be raised on appeal . . . unless the appeal record, within its own confines, establishes beyond possibility of ration-

al disagreement the existence of representational deficiencies by counsel which are plainly beyond rational explanation or justification and are of sufficient magnitude to have made the trial, in effect, a sham. *State v. LeBlanc*, Me., 290 A.2d 193, 202 (1972) (citations omitted).

   Our review of the record finds no such deficiencies. In fact, the trial Justice made the following comment before charging the jury:
   *I wish to commend counsel for both the State and the Defendant . . . . Both sides are entitled to proper, full representation and both sides were properly fully and most adequately represented. Neither side can feel that something was left undone which should have been done.*

*ant of a fair trial. State v. Northup*, Me., 318 A.2d 489, 499 (1974).

In order to make such a determination, we must scrutinize the record in its entirety. *Id.*

■ Although the trial Justice failed to give a specific instruction regarding the defense of accident, the jury was more than adequately instructed regarding the crimes of second, fourth and fifth degree homicide, as well as to the fact that the State carried the burden of proving every element of the crime beyond a reasonable doubt. Had the jury entertained any reasonable doubt as to defendant's culpability, *see* 17–A M.R.S.A. § 10 (Supp.1976), they would have had to return a verdict of not guilty. We, therefore, cannot agree with defendant's contention that the trial Justice's failure to specifically instruct the jury on accident was so prejudicial as to deny him a fair trial. *Cf. State v. Lewisohn*, Me., 379 A.2d 1192, 1208 (1977).

Defendant further contends that the other aforementioned *"errors"*, either alone or in concert, evidence a fatal flaw in the fairness of his trial. We cannot agree. We have carefully scrutinized the record in regard to defendant's allegations and find them to be without merit, especially in light of trial counsel's failure to register timely objections. *See generally*, Glassman, *Maine Practice*, § 51.2 (Supp.1975). Defendant, therefore, cannot prevail in his argument that he was denied a fair trial.

## II.

■ Defendant raises as his second point on appeal the argument that the trial Justice erred in excluding evidence of deceased's reputation for violence. The alleged error arose when defense counsel sought to elicit testimony from defendant regarding a conversation he had had with one Steven Philmore. The purpose behind such testimony was to show that defendant's state of mind had been affected by his knowledge of deceased's violent background. The trial Justice, over defense counsel's claim that the conversation was offered *only* for purposes of showing defendant's state of mind and *not* to prove the truth of the matter asserted, sustained the State's hearsay objection and limited defendant to testifying merely that a conversation had taken place and that it had had an effect upon him.[6] Defendant now claims that the trial Justice's ruling was erroneous and warrants the granting of a new trial.

We disagree.

Rule 801(c), M.R.Evid., defines hearsay as *a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.*

As defendant's testimony was only offered to show his state of mind, the trial Justice was wrong in excluding it on hearsay grounds,[7] a fact the State concedes in its brief. *See e. g., State v. Northup*, 318 A.2d 489 (1974). The State, however, argues that it was within the trial Justice's discretion to exclude the testimony in question on the grounds that it was highly prejudicial, *see* Rule 403, M.R.Evid., and, therefore, any error resulting from its exclusion as hearsay could not have prejudiced defendant. Although we agree with the State that an analytical error is *"harmless"* as long as the ultimate resolution is correct, *see State v. Gwinn*, Me., 390 A.2d 479 (1978), we find nothing in the record to show that the trial Justice was exercising his discretion in excluding the testimony, and we, therefore, cannot uphold the exclusion on those grounds. Nevertheless, defendant's contention that the trial Justice's error requires a new trial cannot succeed.

---

**6.** Although defendant's counsel made no specific objection to the ruling, his statement that the conversation was offered to show defendant's state of mind and not for the truth of the matter asserted, properly preserved this point on appeal. *See* Rule 51, M.R.Crim.P.

**7.** Rule 404, M.R.Evid., and the Advisor's Notes thereto, make it clear that such testimony would have been otherwise admissible.

 

Defendant argues that the excluded testimony would have supported the reasonableness of his fear of the deceased, thereby buttressing his claim of self-defense. Whether or not the excluded evidence would, in fact, have had such an effect on the jury is speculative. There was, however, other testimony from which a jury could have determined the reasonableness of defendant's fears.[8] Any testimony regarding defendant's conversation with Philmore would, therefore, have been merely cumulative, thus rendering the trial Justice's error harmless.[9] *State v. Rhoades*, Me., 380 A.2d 1023 (1977); *Commonwealth v. Rawlins*, 352 Mass. 293, 225 N.E.2d 314 (1967). *See also, Commonwealth v. Hogg*, Mass., 344 N.E.2d 924 (1976) (dictum).

### III.

Defendant's final point on appeal alleges that the trial Justice erred in refusing to require the State to furnish defendant with any and all of deceased's criminal records. Defendant argues that such records were material in that they would have corroborated his testimony that the deceased was the aggressor in their various confrontations. In support of his position, defendant cites *Evans v. United States*, 107 U.S.App.D.C. 324, 277 F.2d 354 (1960) and *Griffin v. United States*, 87 U.S.App.D.C. 172, 183 F.2d 990 (1950). In *Evans*, the District of Columbia Circuit Court of Appeals held that it was reversible error to exclude evidence of the deceased's bellicose nature, offered to show he acted in conformity therewith.

Notwithstanding the District of Columbia's [10] adoption of such a rule, it is not the rule in Maine. Rule 404(b), M.R.Evid. states, *"[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he*

acted in conformity therewith." *See also,* Rule 404(a), M.R.Evid. and the relevant Advisors Notes; *State v. Mitchell*, Me., 390 A.2d 495 (1978). We, therefore, hold that the trial Justice did not err in refusing to grant defendant's motion seeking discovery of deceased's criminal records.

The entry must, therefore, be:

Appeal denied.

Judgment affirmed.

GODFREY, J., did not sit.

---

**8.** Aside from the testimony regarding the fight, Howie Michaud's father testified that Lubinsky had previously been in prison and had engaged in numerous other fights using *"knives and everything else."*

**9.** We need not address the harmless-constitutional error standard of *Chapman v. California,*

386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), as defendant has not alleged any errors of a constitutional dimension.

**10.** Cf. *State v. Miranda*, Conn.Sup.Ct. (Sept. 12, 1978) 24 Crim.Law Rptr. 2008.